# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **CRIMINAL ACTION NO.** |
| | **5:21-cr-00028-TES-CHW-1** |
| **JONATHAN BRYANT,** | |
| *Defendant.* | |

## ORDER GRANTING MOTION TO SUPPRESS

Our Constitution doesn't forbid all searches and seizures against the inestimable right of personal security; it only guards against those that are unreasonable. *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

Since 1968, virtually every law student and law enforcement officer has studied *Terry v. Ohio*, easily one of the most important and recognizable Fourth Amendment cases ever authored. In *Terry,* the United States Supreme Court articulated the principle that a law enforcement officer does not violate the Fourth Amendment if he conducts a limited search of a citizen "in an attempt to discover weapons which might be used to assault him." *Id.* at 30–31. However, this narrowly drawn authority permitting a reasonable search for weapons must be "coupled with a highly developed system of judicial controls to enforce upon the agents of the State the commands of the Constitution." *Id.* at 11, 27. Like most Fourth Amendment cases, this case requires the Court to balance the seemingly incompatible right of law enforcement officers to search

citizens for their own protection against citizens' rights to be free from unreasonable searches.

Pulling from the text of the Fourth Amendment, the Supreme Court has affirmed over and over that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014); *Riley v. California*, 573 U.S. 373, 381 (2014); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). And, in the Fourth Amendment arena, "[r]easonableness" demands "a balance between the public interest and [an] individual's right to personal security free from arbitrary interference by law [enforcement] officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). The performance of police work, by its very nature, often interferes with an individual's personal security. However, when police interference "trenches upon personal security without . . . objective evidentiary justification . . . . it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials." *Terry*, 392 U.S. at 15.

## PROCEDURAL BACKGROUND

On June 9, 2021, the Grand Jury charged Defendant Jonathan Bryant with one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). [Doc. 1, p. 1]. In his Particularized Motion to Suppress and Dismiss [Doc. 27], Defendant Bryant argues that but for an illegal search, a police officer

wouldn't have found a pistol tucked into the waistline of his pants. So, he wants to make sure that jurors never see or hear about it.

In less than two pages of text, the Government rather blandly argues—almost exclusively—that officer safety permitted the search of Defendant Bryant. [Doc. 33, pp. 3–5]. On December 7, 2021, the Court held an evidentiary hearing on Defendant Bryant's suppression motion where the Government called a single witness: Corporal Travis Wade Carlisle from the Bibb County Sheriff's Office. The parties also offered two body camera videos as exhibits. [1] Here is what the evidence shows.

## FACTUAL BACKGROUND

Suffice it to say, the facts of this case are unique.

A little after midnight on December 11, 2020, Deputy Carlisle observed two westbound vehicles en route from Brunswick to Atlanta, Georgia, traveling 14 miles per hour over the posted speed limit on Interstate 16. Emily Baker drove the lead vehicle, a Chrysler owned by her husband, Kendrick Green, and the second vehicle, a Mercedes-Benz, held two passengers—the driver, Baker's husband, and its owner, Defendant Bryant. Carlisle testified that he initiated a traffic stop on the Chrysler for speeding. And although Carlisle was clear that he did not simultaneously stop the Mercedes or

---

[1] The Government admitted one video recording: an eight-minute portion of the nearly two-hour traffic stop from Deputy Carlisle's body camera. When referring to video from Carlisle's perspective, the Court will refer to it as "Carlisle's Body Cam." Defendant, however, placed a much longer video (about an hour and 45 minutes) of the traffic stop from the body camera of Corporal Grube, another on-scene officer, into evidence. When referring to video from Deputy Grube's perspective, the Court will refer to it as "Grube's Body Cam."

even consider himself to have stopped the Mercedes, he testified that it nonetheless pulled over in front of the stopped Chrysler.

At the very beginning of the traffic stop, Grube's Body Cam shows Carlisle standing just outside of the driver-side door of the Chrysler, speaking to Baker who was sitting in its driver seat. Carlisle testified that Baker told him that her husband was driving the Mercedes because Defendant Bryant was tired.[2] During this initial interaction, Carlisle also testified that he smelled the odor of marijuana emanating from the Chrysler. Looking at Grube's Body Cam, this initial interaction between Carlisle and Baker lasted for just over a minute, then Carlisle started walking towards the Mercedes. Green, still seated in the driver seat of the Mercedes, had opened the driver door, and for a little over two minutes, Carlisle stood just beside it while he first spoke with Green and Defendant Bryant.[3]

On his way back to his patrol car, Carlisle passed Baker who was still seated in the Chrysler and told her, "I'll be right back, okay." Then Carlisle informed Deputy Grube that the Chrysler "smells like weed." Relying on the suspected presence of marijuana, Carlisle ordered Baker out of the Chrysler and told her that he was going to

---

[2] The Supreme Court has "noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself." *United States v. Raddatz*, 447 U.S. 667, 679 (1980). Therefore, courts "may rely on hearsay and other evidence" at a suppression hearing "even though that evidence would not be admissible at trial." *Id.*; *see also* Fed. R. Evid. 104(a), 1101(d)(1).

[3] Unfortunately, neither party admitted the portion of Carlisle's Body Cam that would have recorded his initial conversation with Green and Defendant Bryant. From the Court's perspective, that would have been helpful.

"check" the Chrysler "real quick." Before starting his search, Carlisle asked Baker if she had any bags or luggage in the Chrysler, and Baker responded, "Yeah, in the trunk."

Consistent with Carlisle's testimony, Grube's Body Cam shows that Carlisle removed luggage from the trunk of the Chrysler and uncovered an AR-style rifle in the trunk's spare tire compartment. Then, in the midst of searching the backseat area of the Chrysler, Carlisle found a handgun, along with what he suspected to be marijuana and several different types of controlled substances in a hidden compartment in the center console. Leaving the handgun and the suspected marijuana and controlled substances in the backseat area of the Chrysler, Carlisle then paused his search, walked towards Baker, and placed her in handcuffs.

"Can you tell me what's going on?" Baker asked.

Carlisle replied, "Not right now. I'll tell you in just a few minutes, okay." Before asking Baker whether she had "anything on [her]," Carlisle told Grube that other police officers were on their way to the scene. With Baker secured in handcuffs, Carlisle resumed his search of the backseat of the Chrysler. As he searched, Carlisle radioed to dispatch, "I've got one 10-26'ed."[4]

Dispatch radioed back, "10-4," and Carlisle said, "For now."

---

[4] Even though it was never explained to the Court what it means for a police officer to "26" someone, it can be assumed (based on Deputy Carlisle's comments and actions) that "26-ing" someone means to detain a civilian in handcuffs just shy of a formal arrest.

Moments later, Carlisle emerged from the backseat of the Chrysler holding the handgun and walked to his patrol car. Seated in his patrol car with the handgun, Carlisle (obviously referring to Green and Defendant Bryant) said to Grube, "They're gonna be 26-ed, too."

Grube, acknowledging Carlisle's comment said, "Alright," but he also asked whether he needed to "hold off until" the other police officers arrived on the scene.

"Yeah," Carlisle answered.

Again, Baker—this time to Grube—asked, "Can you tell me what's going on?" Grube assured Baker that Carlisle would speak with her, and he then followed Carlisle to the Chrysler. Once Carlisle updated Grube on what he found in the backseat area of the Chrysler, Carlisle reached back in and pulled out two separate plastic bags that contained the suspected marijuana and controlled substances. After he placed the plastic bags in his patrol car, Carlisle (again referring to Green and Defendant Bryant) said to Grube, "I'm surprised they haven't driven off yet."

"I'm surprised, too," Grube replied.

For a second time, Baker asked Carlisle, "Sir, can you tell me what's going on?"[5] In response, Carlisle says, "Yes, ma'am. I'll tell you what's going on. Okay. First thing, the car smelled like marijuana, okay."

"Correct," Baker admitted.

---

[5] This is where the eight-minute portion of Carlisle's Body Cam begins.

"So, that's why we're searching it, alright" Carlisle continued. "You have a compartment, a hidden compartment up under the center console that you have marijuana, Xanax, and some other type of pills. Okay. And there's two firearms that were in the car."

"One of them is mine, and it's in my name," Baker informed Carlisle. However, after a little further explanation, Carlisle placed Baker under arrest and informed her of the charges for which she was being arrested.

"Are you gonna go talk to him?" Baker asked, presumably referring to her husband.

Carlisle said, "Yeah, ummm. They're gonna go with you."

"They're gonna go with me? Why?" Baker questioned.

"'Cause y'all are all in on it," Carlisle told her.

"All in on it? What do you mean 'All in on it?'" Baker wanted to know.

"I mean, you weren't transporting dope by yourself," Carlisle added. "There's a reason y'all are all going down [*sic*] there together. But we'll, somebody's gonna talk to you about it, okay. So, just hang on."

At the suppression hearing, Carlisle elaborated on the events during the traffic stop of the Chrysler. Specifically, Carlisle confirmed that he suspected that Baker, Green, and Defendant Bryant all had knowledge of the controlled substances found in the Chrysler and that he suspected that all three of them "were knowingly involved in

the transportation of either guns or drugs." With just over eight years of employment with the Bibb County Sheriff's Office, Carlisle testified that—based on "more than a hunch"—he had this suspicion because they were following each other, because Baker admitted that her husband (before he started driving the Mercedes) had previously been in the Chrysler, and because the hidden compartment inside the Chrysler was common with smuggling contraband.

After telling Baker his suspicions about her, Green, and Defendant Bryant "transporting dope," Carlisle approached another police officer—his supervisor, then-Sergeant Alan Kendrick—who had just arrived on the scene. When watching Carlisle's Body Cam, Carlisle can be heard relaying his suspicions to Deputy Kendrick about Green and Defendant Bryant being involved with the items he found in the Chrysler. Carlisle also informed Kendrick that he "hadn't 26-ed" Green and Defendant Bryant "yet." Then, just after telling Kendrick why he stopped the Chrysler, Carlisle unmistakably said to him that he "didn't smell anything" in the Mercedes.

Nevertheless, relying on his "more than a hunch" suspicion, Carlisle—having waited on Kendrick to arrive on the scene—walked back to the Mercedes and asked Green to step out. As Green began to exit the Mercedes, Carlisle asked him if he had any weapons on him. At the suppression hearing, Carlisle testified that he felt the need to do this for the "safety of the officers on scene" and "due to the other weapons that had been found." Carlisle made sure that Green understood that although he was being

8

placed in handcuffs, he was not under arrest but was merely being detained. *See* n.4, *supra*. After concluding a brief pat down, Carlisle testified that he did not "discover any items of criminality on [Green]."

However, the same cannot be said for Defendant Bryant. As Carlisle was tending to Green, Grube walked up to the passenger-side door of the Mercedes and said to Defendant Bryant, "Hey, hop out for me real quick, Boss." Following Green's pat down, Carlisle's Body Cam shows Defendant Bryant placing his hands on the trunk of the Mercedes while Grube engages in a brief pat down of Defendant Bryant's outer clothing. Carlisle testified that he did not think it was unusual for Grube to ask Defendant Bryant to step out of the Mercedes and undergo a pat down for officer safety. According to Carlisle's testimony, it was even reasonable for Grube to rely on the same basis that Carlisle used to pat down Green to conduct the pat down of Defendant Bryant.[6]

---

[6] This, however, is not necessarily true. Generally, yes, police officers "can lawfully act solely on the basis of statements issued by fellow [police] officers if the [police] officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis." *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) (citation omitted). As part of the review of the totality of the circumstances, courts examine the collective knowledge of all the officers involved. *United States v. Cotton*, 721 F.2d 350, 352 (11th Cir. 1983). However, as the Court will explain below, there simply wasn't a requisite basis to search Defendant Bryant.

Just after Grube requested Defendant Bryant to step out of the Mercedes, Grube's Body Cam recorded a small exchange between Grube and Defendant Bryant.[7] Grube asked Defendant Bryant, "You ain't got nothing on you, do you?"

Defendant Bryant responded, "Oh no. No. No."

Grube still proceeded to "check [Defendant Bryant] real quick," and seconds later, Grube asked Defendant Bryant, "What's this?" *See* n.12, *infra*. Unsure as to what was in the waistline of Defendant Bryant's pants, Carlisle said to Grube, "Just 26 him." As instructed, Grube placed Defendant Bryant in handcuffs and once secure, Grube continued to pat Defendant Bryant's outer clothing. Moments later, Grube extracted a pistol from the waistline of Defendant Bryant's pants. Now, with Green and Defendant Bryant secure for officer safety, Carlisle initiated a canine sniff of the exterior of the Mercedes. Neither the canine sniff nor the extensive search of the Mercedes by Carlisle and Grube revealed any contraband.

In Carlisle's own words, he testified that "based on the suspicion that they were operating together, we were going to have [Green and Defendant Bryant] step out of

---

[7] Although both Carlisle's Body Cam and Grube's Body Cam recorded this small exchange, the Court relies on Grube's Body Cam for this portion of the traffic stop since the voices are clearer and better understood.

the [Mercedes] for a canine sniff.[8] And for that reason, after they were stepped out of

the [Mercedes] they were patted down" for officer safety.

## DISCUSSION

The inordinate risks confronting police officers as they approach an automobile

at a traffic stop have long been recognized. *See Mimms*, 434 U.S. at 110. That is why

police officers may take steps that are reasonably necessary to protect their legitimate

concerns for personal safety when carrying out a lawful traffic stop. *Id.* at 111; *United*

*States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009). Thus, once police officers lawfully

decide that the driver of a vehicle is going to be briefly detained, the question becomes

whether the driver "shall spend that period sitting in the driver's seat of his car or

standing alongside it." *Mimms*, 434 U.S. at 111.

Remember though, Carlisle unequivocally testified that he didn't stop the

Mercedes—the vehicle carrying Defendant Bryant as a passenger. Carlisle stopped the

Chrysler for speeding, and Green, who was driving Defendant Bryant's Mercedes,

voluntarily pulled over in front of the stopped Chrysler. Why? We don't know. Did

Green tell Carlisle why he also pulled over? Again, we don't know. Neither the

Government nor Defendant Bryant placed the potentially important portion of

---

[8] Carlisle never explained why he could not conduct a canine sniff of the exterior of the Mercedes with Green and Defendant Bryant sitting inside it. Perhaps it is standard for all canine officers to only conduct open-air sniffs of empty vehicles for the safety of the officer and the dog. This would make sense. However, without testimony on this specific point, the Court would be just guessing.

Carlisle's Body Cam into evidence that would have recorded the first conversation between Carlisle, Green, and Defendant Bryant during their initial interaction, and although Grube's Body Cam shows this initial interaction from a distance, it doesn't audibly capture the answer to these questions either.[9] Fact is, the record is silent as to why Green decided to voluntarily pull over and remain at the traffic stop, but why he did so could have been for a number of reasons. It could have been because his wife was getting pulled over. It could have been because he owned the vehicle that was getting pulled over. Or, since he owned the Chrysler, Green just might've decided to also pull over because he knew what was in it. All of these are valid, reasonable explanations, and whichever one is Green's actual reason, his independent decision to pull over and wait until Carlisle completed the traffic stop on the Chrysler removes any reasonable argument from the equation that the Mercedes wasn't lawfully stopped. [Doc. 27, pp. 1, 3]. It wasn't a stop at all.

From Defendant Bryant's standpoint, he argues that timing is everything in this admittedly unique Fourth Amendment matter. The Court's recitation of essential facts detailed above certainly tells the sequence of events that unfolded during the traffic stop on the Chrysler, but it doesn't tell how much time passed between each pivotal

---

[9] For reasons that will become clear later in this opinion, to the extent those reasons aren't already discernable, inclusion of the full recording of Carlisle's Body Cam would have greatly aided the Court in its analysis. Nevertheless, the Government and Defendant Bryant had the opportunity to develop the record as they deemed necessary, and at this point—in ruling on Defendant Bryant's suppression motion—the record simply is what it is.

stage. For example, Grube's Body Cam shows that a little over 17 minutes passed between Carlisle's first interaction with Baker seated in the Chrysler and his subsequent discovery of the AR-style rifle in its trunk. Almost ten-and-a-half minutes later, Grube's Body Cam shows Carlisle pulling himself from the backseat area of the Chrysler holding the handgun he found in the hidden compartment in the center console. At this point, simple math tells us that Carlisle's traffic stop involving the Chrysler has already lasted nearly half an hour. Notwithstanding Carlisle's initial two-minute conversation with Green and Defendant Bryant, this also means that he and Grube allowed them to sit in the Mercedes for that same amount of time completely unattended—and for nearly 20 minutes after finding the rifle.

The discovery of the handgun in the Chrysler is undeniably important, but when it comes to Carlisle's thoughts regarding officer safety, it's the discovery of the rifle that really matters. From Carlisle's testimony at the suppression hearing and from Grube's Body Cam, it should be very clear by now that Carlisle never intended to stop the Mercedes. That certainly explains why neither Carlisle nor Grube wrote Green a ticket or—until Green and Defendant Bryant were finally asked to step out of the Mercedes— never interacted with either occupant after Carlisle first spoke with them. In fact, 13 minutes after Carlisle discovered the rifle, he clearly didn't consider either occupant of the Mercedes detained or arrested because he commented to Grube that he "was

surprised" Green and Defendant Bryant hadn't "driven off yet."[10] Then, almost four-and-a-half minutes later, Carlisle and Grube finally approached the Mercedes and asked Green and Defendant Bryant to step out of the vehicle, ultimately leading to the discovery of the pistol concealed in the waistline of Defendant Bryant's pants.

From Point A—the discovery of the rifle—to Point B—Carlisle's approach of the Mercedes to have Green exit the vehicle—nearly 20 minutes passed. Overall, 35 minutes and 15 seconds had passed since Grube's Body Cam started recording the traffic stop on the Chrysler. Based on this, Defendant Bryant argues that if Carlisle truly "had any concern for officer safety" then he would have had Green and Defendant Bryant step out of the Mercedes as soon as he discovered the rifle in the trunk of the Chrysler. [Doc. 27, p. 2]. To Defendant Bryant's credit, this argument is a legitimate one given the almost 20-minute gap, but it fails to take into account the knowledge Carlisle obtained throughout the progression of his traffic stop on the Chrysler.

Yes, Carlisle made the comment to Grube that he was "surprised" that Green and Defendant Bryant hadn't "driven off yet," but that comment doesn't necessarily work to overcome everything he learned during his initial interactions with Baker,

---

[10] What's more, Carlisle even testified that had Green and Defendant Bryant communicated their desire to leave, that would have been "a permissible course of action for them to undertake."

Green, and Defendant Bryant.[11] Carlisle testified that "Baker had told [him] at the beginning of the traffic stop that her husband was driving the Mercedes because [Defendant] Bryant . . . was tired. So, [Green] took over for [Defendant Bryant]." Also, according to Carlisle's testimony, Baker admitted to him that Green—since they started their trip from Brunswick to Atlanta—had been in the Chrysler "prior" to him switching vehicles and driving the Mercedes. So, despite Carlisle's comment to Grube that he was surprised that the Mercedes had stayed during his search of the Chrysler, it's obvious that Carlisle—relying on what Baker told him—had every intention of getting the occupants of the Mercedes out of the vehicle because he suspected they were all involved in the carry and concealment of the suspected marijuana and other controlled substances. Carlisle's conversations with Baker bolster the Court's conclusion that he had already made up his mind to get Green and Defendant Bryant out of the Mercedes: he told her that Green and Defendant Bryant were "gonna go with [her]" because they're "all in on it." "[I]t," of course, referring to Carlisle's suspicion that they were "transporting dope." The question from Carlisle's position was simply a matter of when he could get Green and Defendant Bryant out of the Mercedes.

---

[11] Again, the Court stresses that having the full version of Carlisle's Body Cam in the record would have been very helpful to account for what all Carlisle was told during his initial interactions with Baker, Green, and Defendant Bryant. Without it, Court is left to rely solely on Carlisle's testimony from the suppression hearing.

So, why did Carlisle wait almost 20 minutes to start getting Green and Defendant Bryant out of the Mercedes? Looking at the evidence as a whole, *see Bishop*, *infra*, the delay—as the Government argues in its opposition with devastatingly little explanation—was apparently Carlisle's concerns for officer safety. After Carlisle formally placed Baker under arrest, he waited by his patrol car and lit himself a cigarette. As he's waiting, Grube's Body Cam shows flashing blue lights in the distance quickly approaching the scene. Carlisle then closed the driver door of his patrol car and walked towards the oncoming police vehicle being driven by Kendrick, his supervisor. Once Carlisle had updated Kendrick on all that had transpired since he stopped the Chrysler, Carlisle and Grube asked the occupants of the Mercedes to step out of the vehicle. Again, Carlisle testified that he did so because "[he] had a suspicion that [Baker, Green, and Defendant Bryant] were involved together."

Briefly discussed above, *Mimms* tells us that police officers, as a matter of course, may order the driver of a lawfully stopped car to exit his vehicle. 434 U.S. at 110–11. Years later, in *Maryland v. Wilson*, the Supreme Court expanded this rule and "held that during a lawful traffic stop [a police] officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." *Brendlin v. California*, 551 U.S. 249, 251 (2007) (citing *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997)). The first wrinkle in this case is, of course, the fact that Carlisle absolutely did not "stop" the Mercedes—he stopped the Chrysler. As the Court has

suggested numerous times, inclusion of body camera footage of what was said when Carlisle first spoke with the occupants of the Mercedes would have created a more fully developed record. Nevertheless, the fact remains that the Mercedes didn't leave. Not knowing what was said in this initial interaction, the Court can only assume—based on Carlisle's comment to Grube that he was "surprised" that Green and Defendant Bryant hadn't "driven off yet"—that Carlisle didn't know why they stayed.

So, had Carlisle actually stopped the Mercedes, *Mimms* would allow him to get Green out of the Mercedes, and *Wilson* gave Grube the authority to ask Defendant Bryant to step out as well. But again, these two cases only permit police officers to order the occupants out of a vehicle they have lawfully stopped, and Carlisle clearly testified he didn't stop the Mercedes. Even assuming that Green and Defendant Bryant staying on the scene somehow included the Mercedes into the Chrysler's traffic stop so that Carlisle and Grube could legally order them out of their vehicle, whether Carlisle and Grube could pat them down is a completely different issue. Only when a police officer has a reasonable suspicion that the person may be armed and dangerous, can the police officer conduct a limited search of an occupant's outer clothing for weapons. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

At this point, our inquiry becomes *Terry*-based: "[W]hether a reasonably prudent [police officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27 (citation omitted). In determining whether

a suspicion was reasonable, courts "evaluate the totality of the circumstances

surrounding the stop, including the collective knowledge of all officers involved . . . ."

*United States v. Bishop*, 940 F.3d 1242, 1249 (11th Cir. 2019) (citing *United States v. Cotton*,

721 F.2d 350, 352 (11th Cir. 1983)); *see also* n.6, *supra*.

"*Terry* does not demand definitive evidence of a weapon or absolute certainty

that an individual is armed."[12] *Bishop*, 940 F.3d at 1250 (citation omitted). Reasonable

suspicion is not concerned with "hard certainties, but with probabilities[.]" *Id.* (quoting

*United States v. Cortez*, 449 U.S. 411, 418 (1981)). And even though police officers may

rely on "common sense conclusions[,]" *id.*, the "reasonable suspicion" standard

"requires an objectively reasonable fear based upon *specific facts* regarding *specific*

*individuals*." *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1981) (emphasis

---

[12] Defendant Bryant argues that Grube saying, "What's that?" when he initially felt the pistol felt in Defendant Bryant's pants means that Grube's search should have concluded right then and there. [Doc. 27, p. 2]. That argument, however, is misguided.

> As some courts put it, it must be asked whether the object 'feels like a weapon' or was one the [police] officer 'reasonably believed could have been a weapon,' or whether on the other hand there was anything in the [police] officer's 'perception to indicate it was not a weapon either because of size or density.'
>
> Some of the language quoted above is a bit misleading, for the test is an objective one, so that the question is *not* what the [police] officer conducting the frisk believed was the case, but rather what a reasonable [police] officer in such circumstances would have concluded.

4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.6(c) (5th ed. 2012).

added). Generalized suspicions or a "hunch" will not justify a limited search, or frisk,[13] of an occupant's outer clothing for weapons. *Id.* at 1074–75.

"[S]o long as it is clear that [the police officer] was aware of specific facts which would warrant a reasonable person to believe that he was in danger[,]" his search is appropriate. *Id.* at 1074. As stated at the outset of this opinion, when police interference "trenches upon personal security without . . . objective evidentiary justification . . . . its fruits must be excluded from evidence in criminal trials." *Terry*, 392 U.S. at 15.

Here, the evidence demonstrates that Carlisle suspected that Baker, Green, and Defendant Bryant "were knowingly involved in the transportation of either guns or drugs[]" because they were following each other, because Baker admitted that Green (before he started driving the Mercedes) had previously been in the Chrysler, and because the hidden compartment inside the Chrysler was common with smuggling contraband. Further, "based on" Carlisle's "suspicion that they were operating together, [he and Grube] were going to have [Green and Defendant Bryant] step out of the [Mercedes] for a canine sniff. And for that reason, after they were stepped out of the

---

[13] Although the *Terry* court didn't focus on the differences between a "stop" and a "frisk," the Eleventh Circuit has elaborated on how these two totally separate activities "serve distinct purposes and require distinct justifications." *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987). A stop allows a police officer to investigate his suspicions into a potential crime. *Id.* "A frisk," though, "does not always result from, nor is it necessarily a part of, any focused investigation of the individual." *Id.* Sometimes, "the need for a frisk does not always arise out of an intentional encounter." *Id.* "Rather, when [a police officer] legitimately encounters an individual, whether he is investigating that individual or not, the [police] officer may reasonably believe himself to be in danger and may wish to determine quickly whether that person is armed." *Id.* "In sum, a stop serves to investigate crime, while a frisk serves to prevent injury." *Id.*

[Mercedes] they were patted down" for officer safety. Finally, in briefing to the Court, the Government argues that "[a]ny perceived officer threat by Green could . . . be imputed to [Defendant] Bryant by virtue of being a passenger in close proximity to Green." [Doc. 33, p. 5]. However, the Government provides no case law for this proposition.

Traffic stops have the potential to present ever-evolving situations. "What is or is not reasonable at a given moment during" the progression of a traffic stop "depends on 'how events unfold[.]'" *United States v. Reyes Reyes*, 475 F. Supp. 3d 27, 36 (D. Mass. 2020) (quoting *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017)). "The information the [police] officer possesses at each successive moment directly informs the reasonableness of his subsequent actions." *Reyes Reyes*, 475 F. Supp. 3d at 37 (citing *Terry*, 392 U.S. at 10) (stating that police officers "are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess[]").

Based on "more than a hunch" that Baker, Green, and Defendant Bryant were "all in on it," Carlisle had Green step out of the Mercedes. But the three—maybe four— reasons upon which Carlisle based this suspicion doesn't provide the requisite specific facts particular to Defendant Bryant to justify a search of his outer clothing. *See Bonds*, 829 F.2d at 1074. At best, had Carlisle stopped the Mercedes as well, the facts of this case would have possibly permitted the removal of Defendant Bryant from it under *Wilson*, but that's as far as it goes.

Considering Carlisle's personal credibility, the Court believes his testimony—he truly thought they were "transporting dope" together.[14] To that end, the fact that Carlisle testified that he didn't smell marijuana in the Mercedes is critical. When asked whether he had any probable cause to affiliate the Mercedes with "any type of drug activity at that particular time," Carlisle answered, "Not from the odor of marijuana." So, clearly, Carlisle's search was based on exactly what he told the Court—it was really Baker's admission that she, Green, and Defendant Bryant were all traveling together and that Green had just been in the Chrysler until he switched to drive the Mercedes. When it comes down to it, Carlisle suspected that he would find illegal substances in the Mercedes, and he intended to search it. And even though Carlisle's "more than a hunch" suspicion proved wrong, the law nevertheless required him and Grube to harbor an "objectively reasonable fear based upon specific facts regarding specific individuals" that their safety was in danger before they could lawfully subject Defendant Bryant to a search for weapons. *Bonds*, 829 F.2d at 1074; *Terry*, 392 U.S. at 27. Bottom line, Baker's admission didn't give Carlisle any reason to search the Mercedes; thus, he and Grube had no reason to get Defendant Bryant out of the vehicle and subsequently search him to ensure their safety.

---

[14] Apparently, the Macon Judicial Circuit District Attorney disagreed with Carlisle. The record contains nothing showing that she ever prosecuted any drug-related charges against either Green or Defendant Bryant, despite the fact that they were clearly traveling together.

Not once did Carlisle tell the Court during the suppression hearing why or when he became concerned for his safety. It may have been when he discovered the rifle in the trunk of the Chrysler. It may have been when he found the handgun in the hidden compartment in the center console. Perhaps, since it's not per se illegal to carry a firearm in this country, it could've been when he discovered the rifle and handgun *with* the suspected marijuana and controlled substances. Whatever the case may be, Carlisle's "more than a hunch" suspicion that Baker, Green, and Defendant Bryant were "all in on it" because they were traveling together didn't permit a search of the Mercedes, let alone Defendant Bryant.

Had the Mercedes been lawfully stopped, Green's connection to Baker and his Chrysler and its contents could be enough to get him out of the Mercedes and conduct a "carefully limited search of [his] outer clothing . . . to discover weapons." *Mimms*, 434 U.S. at 110–11; *Terry*, 392 U.S. at 30. Point is, just because Carlisle found two firearms and suspected marijuana and controlled substances in Green's Chrysler doesn't necessarily mean that Defendant Bryant also had those items in his Mercedes just because Green was driving it.

Relying on *Bonds*, it isn't at all clear that Carlisle or Grube were "aware of specific facts which would warrant a reasonable person to believe that [they were] in danger." 829 F.2d at 1074. Put succinctly, the record simply lacks the "objective evidentiary justification" to legitimize the search of Defendant Bryant's outer clothing

given that the police officers had no basis upon which to search the Mercedes. *Terry*, 392 U.S. at 15. For example, both Carlisle's Body Cam and Grube's Body Cam shows that Defendant Bryant was calm, collected, and compliant throughout the entire encounter. Unlike other cases, the evidence here doesn't show that Defendant Bryant did anything out of the ordinary or create circumstances that would lead Carlisle or Grube to reasonably suspect that they should be concerned about their safety. *See, e.g., United States v. Jones*, No. 19-20724-CR-MIDDLEBROOKS/MCALILEY, 2021 WL 1240483, at *4–5 (S.D. Fla. Jan. 21, 2021). Defendant Bryant never defied a police officer's command. He never turned his back on any of the police officers on the scene and in turn cause them to worry about why he did so. And, Carlisle never testified that Defendant Bryant attempted to conceal or hide anything prior to his removal from the Mercedes.

If officer safety had truly been forefront in Carlisle's mind, the Court finds it difficult to reconcile that he and Grube would have let the two people causing them such concern sit in the Mercedes unattended for nearly 20 minutes. No, what really happened here was that Carlisle had made up his mind that Defendant Bryant and Green were helping Baker "transport dope," and he was determined to prove his hunch was right by searching the Mercedes.

Most tellingly, though, when looking at the circumstances of this case through an objective lens, is the fact that Defendant Bryant never attempted to confront or address either Carlisle or Grube. He never interfered with Carlisle's stop of Baker, nor did he

ever obstruct Carlisle or Grube in any way. [15] *See Bonds*, 829 F.2d at 1074. He simply sat in the Mercedes (his own car) until Grube asked him to step out. Without any testimony that Defendant Bryant did anything to rouse Carlisle or Grube's suspicion so that they felt unsafe, the evidence is inconclusive to support a finding that the search of Defendant Bryant's outer clothing was reasonable under the Fourth Amendment. *Terry*, 392 U.S. at 31.

The inconclusive nature of the evidence in this case means that the Government has failed to meet its "burden of proof as to the reasonableness of the search." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) ("Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."). When it comes to governmental-intrusion issues that implicate the Fourth Amendment, the Government can never get the benefit of doubt. Accordingly, the Court **GRANTS in part** and **DENIES in part** Defendant Jonathan Bryant's Particularized Motion to Suppress and Dismiss [Doc. 27].

---

[15] The Court recognizes that families and groups often travel together, although in separate cars. If one car gets pulled over, it's inherently reasonable to think that the other spouse, parent, family member, or friend would also pull over and wait until they could all travel again. Simply waiting in your own car while police officers conduct a traffic stop on another family member or friend's car doesn't somehow waive one's protections under the Fourth Amendment. Had Green or Defendant Bryant interfered with the traffic stop of the Chrysler or otherwise injected themselves into the situation, the Court would have potentially reached a different conclusion.

<u>**CONCLUSION**</u>

The Smith and Wesson, Model: M&P 40 Shield, Serial Number JES2890, seized on December 11, 2020, as listed in the Indictment [Doc. 1] shall be **SUPPRESSED** as evidence. [Doc. 1, p. 1]. However, the Court **DENIES** the portion of Defendant Bryant's motion seeking dismissal of this criminal action. [*Id.*, at pp. 1–2]. That decision is left to the United States Attorney.

**SO ORDERED**, this 6th day of January, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**